Jose A. Valerio MATUTE, Petitioner,

v.

DISTRICT DIRECTOR, IMMIGRATION
AND NATURALIZATION SERVICE,
Respondent.

No. 8:CV96–00249.

United States District Court,
D. Nebraska.

May 28, 1996.

Rufino J. Villarreal, Omaha, Nebraska, for petitioner.

SaraBeth Donovan, Assistant United States Attorney, Omaha, Nebraska, for respondent.

## MEMORANDUM AND ORDER

SHANAHAN, District Judge.

Before the court is filing no. 1, the "Petition for Writ of Habeas Corpus" filed by the petitioner, Jose A. Valerio Matute, pursuant to 8 U.S.C. § 1105a and 28 U.S.C. § 2241(c). On May 9, 1996, the court conducted an evidentiary hearing on Matute's petition.

In his petition, Matute asks this court to grant his writ of habeas corpus, thereby halting his deportation from the United States,

for four reasons: (1) he qualifies for political asylum and submitted similar evidence in his motion to reopen or reconsider his deportation order; (2) he entered this country from Honduras and sought political asylum; (3) the evidence at his deportation hearing does not corroborate his request for voluntary departure and he was incorrectly advised that he had no claim for political asylum; and (4) "the deportation order is based upon suspicion or conjecture only, and the Immigration authorities have abused their authority in entering such order and in not favorably granting [Matute's] request for a stay of deportation pending his motion to re-open with the [Immigration Judge] based upon asylum."

At the hearing on May 9, 1996, Matute clarified the allegations pertaining to his petition for habeas corpus relief. Essentially, Matute contends that his counsel at the deportation hearing were ineffective because his lawyers did not pursue his previously filed application for asylum, but, instead, withdrew the asylum application and accepted a voluntary departure on Matute's behalf. Matute also claims that the district director erred by refusing to stay Matute's deportation until disposition of Matute's pending motion to reopen or reconsider the deportation order.

## BACKGROUND

Matute, a native and citizen of Honduras, illegally entered the United States on July 5, 1994 near Brownsville, Texas. Matute's wife and their four children still reside in Honduras. The Border Patrol arrested Matute and other members of a smuggled alien group on July 6, 1994. At the time of his arrest, Matute informed immigration officials that he was enroute to Nebraska to seek employment.

On July 7, 1994, the Immigration and Naturalization Service (INS) issued an order to show cause concerning Matute's deportability. After his initial hearing was continued so that Matute could retain counsel, Matute appeared on August 5, 1994 in Los Fresnos, Texas with his attorney and admitted the deportation charge. At that time, Matute informed the immigration judge that he

would file an application for asylum (I–589). On August 17, 1994, Matute filed an application for asylum (I–589) in which he alleged that he sought political asylum because he was afraid for his life if he returned to Honduras. Specifically, Matute alleged that as the result of his membership in the Liberal Party, he had received anonymous letters which contained death threats unless he became affiliated with the Nationalist Party.

Matute, who was released on bond pending the hearing on his application for asylum, then moved to Grand Island, Nebraska. On March 21, 1995, Matute appeared pro se before an immigration judge in Omaha, Nebraska. The hearing was postponed so that Matute could obtain counsel. At the deportation hearing on May 30, 1995, Matute appeared with his attorneys, Kevin Ruser, Acting Director of the Civil Law Clinic at the University of Nebraska's College of Law, and a senior certified law student, Carrie Bushouse. At that hearing, Matute withdrew his asylum application (I–589) and accepted voluntary departure which was deferred until November 30, 1995. The immigration judge ordered Matute deported to Honduras in the event that he did not voluntarily leave the United States by November 30, 1995. Matute waived his right to appeal the immigration judge's decision.

On March 15, 1996, a warrant was issued for Matute's deportation on April 5, 1996 because Matute failed to voluntarily depart the United States on November 30, 1995. Subsequently, on April 5, 1996, Matute filed an application to stay his deportation and also filed a motion to reopen and reconsider the deportation order. Additionally, on April 5, 1996, Matute filed a new application for asylum (I–589). On April 29, 1996, the District Director of the Omaha District of the INS denied Matute's application for a stay of deportation. Matute's other motions remain pending before an immigration judge.

At the hearing before this court on May 9, 1996, Matute asserted that he received ineffective assistance of counsel from the University of Nebraska Law Clinic (the "clinic"), specifically, Director Kevin Ruser and law students Carrie Bushouse and Teresa Truksa–Skretta, regarding his deportation hearing on May 30, 1995. Matute claims that the clinic provided him with ineffective assistance

of counsel by refusing to pursue his asylum claim at the hearing and, instead, accepting voluntary departure by Matute.

Also, at the May 9 hearing before this court, Matute asserted that he did not agree to the withdrawal of his application for asylum and disagreed with the clinic's decision not to pursue his asylum claim. According to Matute, he did not tell the clinic the truth about his fear of returning to Honduras because he was nervous. Also, Matute testified that he did not understand why he was told by the clinic that he did not have a strong asylum claim and that he had no reason to stay in the United States. When questioned about what would happen if he returned to Honduras, Matute stated that he was afraid and that he would be killed.

Kevin Ruser testified that the clinic informed Matute that it would not pursue his asylum claim and would instead seek Matute's voluntary departure. Ruser also testified that the clinic made this decision on the basis of the information provided by Matute to Truksa–Skretta and Bushouse, namely, Matute's statements to the clinic that he had come to Nebraska to find employment and that he was not in danger if he returned to Honduras. Ruser admitted that this information conflicted with the information contained in Matute's previous asylum application filed in Texas. The clinic obtained Matute's previous asylum petition before the deportation hearing on May 30, 1995. Ruser did not know if an attorney had prepared the original asylum application filed by Matute in Texas in August of 1994. However, Ruser testified that he believed that Matute did not have a colorable asylum claim due to the information that Matute supplied to the clinic. This information was markedly inconsistent with his previous application for asylum.

Matute was required to provide his own interpreter for meetings with the clinic because the clinic did not have the funds to pay for an interpreter. Communication between Matute and his counsel was difficult as a result of the language barrier between Matute and personnel at the clinic. However, both Truksa–Skretta and Bushouse testified that it appeared that Matute's translator was

interpreting accurately because Matute's answers to their questions were responsive and logical. Bushouse also informed the court that Matute's demeanor during her personal conference with Matute was consistent with the answers translated by the interpreter.

Through a letter sent to Matute before the deportation hearing on May 30, 1995, the clinic attempted to inform Matute of its decision not to pursue his asylum claim. Although the parties stipulated that Matute received at least two letters from the clinic before the deportation hearing, both letters were in English, and there is no indication that the contents of the letters were translated to Matute. However, after his initial contact with the clinic, Matute, presumably through a friend or relative, sent a letter to the clinic requesting that the clinic return all of Matute's paperwork regarding deportation. Consequently, until the day of the deportation hearing on May 30, 1995, the clinic was unsure whether Matute still wanted the clinic to represent him at the deportation hearing.

Immediately before the deportation hearing on May 30, 1995, Matute and his interpreter, a Mr. Cruz, met with Bushouse who attempted to ascertain whether Matute still wanted the clinic to represent him at the deportation hearing. At this time, Bushouse again asked Matute why he wanted to pursue his political asylum claim. In response to Bushouse's repeated questions, Matute answered "political reasons." He provided no further information concerning death threats or any other problems that might arise if he returned to Honduras. On the basis of these responses, Bushouse informed Matute that the clinic would not pursue the political asylum claim but, instead, would attempt to obtain the longest period available before voluntary departure so that Matute could obtain some money for his return to Honduras. Bushouse stated that Matute was unhappy when she told him that the clinic would not pursue the political asylum claim.

Aurora Andrade, an interpreter provided by the immigration court, interpreted the May 30, 1995, deportation hearing for Matute. Bushouse, on behalf of Matute, informed the immigration judge that Matute was withdrawing his asylum application and was seeking voluntary departure. The immigration judge, communicating with Matute through the interpreter, then asked Matute whether he agreed with that "course of action." Matute, through the interpreter, responded that he was not in agreement. In translations by the interpreter, the immigration judge then proceeded to explain to Matute what was proposed by Bushouse, that is, Matute was willing to withdraw his application for asylum and accept a period for voluntary departure so that Matute could leave the United States at his own expense. Matute then responded, "Yes, it's alright." The immigration judge again asked Matute if the withdrawal of his asylum application was really what Matute wanted. Matute again responded, "Yes, it's alright." Bushouse, on behalf of Matute, then proceeded to withdraw Matute's application for asylum. The immigration judge then allowed Matute to voluntarily depart from the United States by November 30, 1995, six months from the date of the deportation hearing. The immigration judge explained what Matute must do to comply with the voluntary departure order. Matute and the government both waived their right to appeal the immigration judge's decision.

## ANALYSIS

### A. Jurisdiction

Although neither party has raised the issue whether the court has subject matter jurisdiction over Matute's claims, this court, pursuant to Fed.R.Civ.P. 12(b)(1), must ascertain the basis for its jurisdiction before proceeding to adjudicate Matute's claim for habeas corpus relief.

### 1. Ineffective Assistance of Counsel

■ Initially, this court must determine whether it has jurisdiction concerning Matute's claim that he had ineffective assistance of counsel concerning the deportation hearing on May 30, 1995.

■ A district court has jurisdiction regarding a claim for habeas corpus relief based on the "denial of discretionary relief [from deportation and] where deportability itself is not an issue." *Daneshvar v. Chauvin*, 644 F.2d 1248, 1251 (8th Cir.1981); see,

also, 8 U.S.C. § 1105a(a)(10). "Judicial review of final orders of deportation, when the question of deportability is in question, is exclusively in the courts of appeals." *Daneshvar*, 644 F.2d at 1250; see, also, 8 U.S.C. § 1105a(a)(4).

Matute contends that this court has jurisdiction regarding his claim of ineffective assistance of counsel because that claim raises a constitutional issue. Cf. *Galaviz–Medina v. Wooten*, 27 F.3d 487, 491–492 (10th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995). However, at least two district courts have interpreted *Daneshvar* as a bar to a habeas claim based on a violation of the Constitution when the claim challenges a final order of deportation. See *Velazquez v. INS*, 876 F.Supp. 1071, 1075 (D.Minn.1995) (district court does not have subject matter jurisdiction to review ineffective assistance of counsel claim insofar as it relates to a final deportation order); *In re Meljarajo*, 552 F.Supp. 573, 574 (N.D.Ill. 1982) (constitutional challenges to deportation hearings are challenges to the validity of the deportation order itself and, thus, are within the jurisdiction of the courts of appeals).

Moreover, in *Daneshvar,* the petitioner claimed that his right to due process was violated because he lacked a sufficient understanding of the English language to appreciate the nature of the proceedings against him. *Daneshvar,* 644 F.2d at 1249. As mentioned above, the Eighth Circuit ruled that despite the alleged constitutional violation, the petitioner could not challenge the validity of the final deportation order in the habeas action and, instead, should have brought his due process claim on direct appeal to the court of appeals. *Id.* at 1251. The court in *Daneshvar* went on to state that even "when deportability under the statute is conceded, but the alien plaintiff claims that the statute itself is unconstitutional," the claim must be part of the direct appeal and is not available in a subsequent habeas action. *Id.* at 1250. Consequently, it appears that even a constitutional claim as an attack on a final order of deportation must be brought on direct appeal, rather than asserted through a petition for habeas corpus relief.

After reviewing Matute's claim based on alleged ineffective assistance of counsel, it is clear that the core of his challenge is the final deportation order entered on May 30, 1995. In substance, Matute is claiming that the final deportation order is fundamentally unfair as the result of ineffective assistance of Matute's counsel and, therefore, constitutes a violation of due process because his counsel withdrew Matute's application for asylum and accepted voluntary departure for Matute. Therefore, the court finds and concludes that it lacks subject matter jurisdiction over Matute's claim based on alleged ineffective assistance of counsel because Matute's claim raises a direct challenge to the final order entered on May 30, 1995 for Matute's deportation. However, to ensure that Matute has received a complete hearing on the matter of deportation, the court will also consider the merits of Matute's allegation that he had ineffective assistance of counsel regarding the deportation ordered on May 30, 1995.

### 2. Denial of Motion To Stay Deportation

■ On April 29, 1996, the district director denied Matute's application to stay deportation pending the resolution of Matute's motion to reopen and reconsider the deportation order. Although this court lacks subject matter jurisdiction to decide Matute's ineffective assistance of counsel claim, the court does have jurisdiction to consider his challenge to the district director's denial of his application for a stay of deportation. Denial of a stay of deportation is discretionary and does not involve the validity of the deportation itself, and, therefore, a district court in a habeas corpus action has jurisdiction to review the denial of a stay. See *Khalaj v. Cole*, 46 F.3d 828 (8th Cir.1995).

■ In reviewing the denial of a motion to stay deportation, a district court must apply an "abuse of discretion" standard. *Id.* at 832. "Abuse of discretion occurs if a decision was without rational explanation, departs from established policies, or invidiously discriminates against a particular race or group." *Id.* The district director may consider and reject an application for a stay of deportation, even if there is a pending motion to reopen and reconsider the deportation or-

der, provided that the district director has given adequate reasons for the decision. *Id.;* see, also, 8 C.F.R. § 243.4. In denying Matute's application for a stay of deportation, the district director, as required by 8 C.F.R. § 243.4 (1995), considered each issue raised by Matute in his application for a stay of deportation. Specifically, the district director considered the following facts in denying Matute's application for a stay:

1. The circumstances surrounding Matute's claim of ineffective assistance of counsel relative to the withdrawal of his application for asylum at the May 30, 1995 deportation hearing;

2. This court's stay of Matute's deportation, pending the disposition of Matute's action for habeas corpus relief;

3. The fact that Matute entered the United States illegally in July, 1994;

4. INS records which indicated that the legal requirements concerning notice of a deportation hearing were followed in Matute's case;

5. The fact that Matute's filing of a new application for asylum and the motion to reopen and reconsider do not automatically stay Matute's deportation; and

6. The fact that the INS opposes Matute's motion to reopen and reconsider the deportation order.

The district director's decision to deny Matute's application was reached after the director examined the underlying INS policies and considered the likelihood that Matute's motion to reopen and reconsider would be granted. After reviewing the reasons and analysis supplied by the district director in his denial of Matute's application to stay deportation, the court finds and concludes that the district director did not abuse his discretion in denying the application. The district director's reasons for refusing to stay deportation are rational, and the director adequately addressed each item raised by Matute in his application for a stay of deportation.

## B. Ineffective Assistance of Counsel

As mentioned above, the court will consider the merits of Matute's claim based on alleged ineffective assistance of counsel.

Because deportation hearings are considered civil proceedings, aliens have no Sixth Amendment right to counsel; instead, the right to counsel at a deportation hearing is governed by the due process clause of the Fifth Amendment. *Henry v. INS,* 8 F.3d 426, 440 (7th Cir.1993). For Matute to prevail on his claim that the clinic failed to provide him with effective assistance of counsel, Matute " 'must show that his counsel's performance was so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.' " *Rabiu v. INS,* 41 F.3d 879, 882 (2d Cir.1994) (citation omitted). To establish that he was deprived of a fundamentally fair hearing, Matute must show that (1) competent counsel would not have withdrawn his asylum application and (2) Matute was prejudiced by the withdrawal of the asylum application. *Id.*

### 1. Effectiveness of Counsel

"A reviewing court uses its own judgment to determine whether an attorney's conduct was ineffective." *Id.* "[I]neffectiveness rises to the level of a due process violation only 'if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.' " *Henry,* 8 F.3d at 440 (citation omitted).

After reviewing the transcript of the deportation hearing conducted on May 30, 1995, and after considering the evidence introduced at the hearing on Matute's habeas petition, the court finds and concludes that the clinic provided competent counsel to Matute during the deportation hearing. Ruser testified that he decided that the clinic would not pursue Matute's asylum claim because Matute had told the clinic that he came to the United States to seek employment and that he would be in no danger if he returned to Honduras. Ruser stated that although he had a copy of Matute's original application filed in Texas for asylum, he believed that on the basis of the information which Matute had given to the clinic Matute did not have a legitimate and meritorious claim for asylum. Ruser testified that he based this determination not only on the information contained in the application and supplied by Matute, but

also upon Matute's likely credibility during the deportation hearing. Ruser testified that in his opinion, it was in Matute's best interests to pursue a voluntary departure rather than the asylum application.

The court believes that the clinic's decision not to pursue Matute's asylum application falls "within the wide range of reasonable professional assistance" expected from competent counsel. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Although the court is troubled by the apparent difficulty in communication between the clinic and Matute, including the fact that the clinic sent letters written in English to Matute despite the fact that Matute could not read English, the court believes that the clinic did an adequate job of representing Matute, both before and during the deportation hearing on May 30, 1995. Immediately before the deportation hearing, Bushouse met with Matute and again asked him why he wanted asylum. Matute responded with a vague answer in reference to "political reasons," but gave Bushouse no other information for an asylum claim. Bushouse then informed Matute that the clinic would not pursue his asylum application because the clinic did not believe he had a legally and factually meritorious claim for asylum. From Matute's demeanor in response to the evaluation of his claim for asylum, Bushouse concluded that Matute understood the clinic's position prior to the deportation hearing.

Moreover, during the deportation hearing, Matute, through the court-provided interpreter, testified that he understood and agreed to the withdrawal of his application for asylum. Although Matute initially objected to the withdrawal, after questioning by the immigration judge, Matute agreed that withdrawing his asylum application was satisfactory or, in Matute's words, was "alright." Consequently, it is clear that Matute understood the impact of withdrawing his asylum application and knew the consequences of accepting a voluntary departure.

The actions of the law clinic, as Matute's counsel, did not render Matute's deportation "fundamentally unfair" and, consequently, did not violate the due process clause of the Fifth Amendment. Therefore, the court finds and concludes that the actions taken by the clinic as Matute's counsel were reasonable and competent and that Matute's petition for habeas corpus relief, based on an alleged ineffective assistance of counsel, should be dismissed.

### 2. Prejudice to Matute

■■■ Even assuming that the clinic failed to provide Matute with effective representation regarding the deportation hearing on May 30, 1995, Matute has not established that he is prejudiced by the withdrawal of his original application for asylum. To establish prejudice, Matute must "make a prima facie showing that he would have been eligible for [political asylum] and that he could have made a strong showing in support of his application [for asylum]." *Rabiu,* 41 F.3d at 882–883; see, also, *Miranda–Lores v. INS,* 17 F.3d 84, 85 (5th Cir.1994) (requisite showing of substantial prejudice).

■■■ The Attorney General has discretion to grant an alien asylum if the Attorney General determines that the alien has been persecuted or has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" and, therefore, is unwilling to return to the alien's country of origin. See 8 U.S.C. § 1158(a); 8 U.S.C. § 1101(a)(42)(A). "To show a well-founded fear of persecution, an alien must show the fear is both subjectively genuine and objectively reasonable." *Ghasemimehr v. INS,* 7 F.3d 1389, 1390 (8th Cir.1993); see, also, *Hajiani–Niroumand v. INS,* 26 F.3d 832, 837 (8th Cir.1994).

To establish the subjective component, the alien may use "credible testimony that the alien fears persecution." *Ghasemimehr,* 7 F.3d at 1390. At the hearing conducted by this court concerning Matute's habeas petition, Matute testified that he was afraid to return to Honduras and that he believed he would be killed if forced to return. Matute did not provide this information to the clinic or to the Border Patrol, although similar information was contained in his original application for asylum filed in Texas.

■■■ However, at the habeas hearing, Matute failed to present any evidence that

would support the objective component of his asylum claim and, consequently, the court has no basis to conclude that Matute was prejudiced by the clinic's failure to pursue his application for asylum. "The objective component is satisfied with credible, direct, and specific evidence of facts that show a reasonable person in the alien's position would fear prosecution if returned to the alien's native country." *Id.* In Matute's original application for asylum, which he filed on August 17, 1994, Matute stated that he had "received anonymous letters threatening [him] with death if [he did] not stop collaborating with the Liberal Party and become affiliated with the Nationalist Party." However, Matute did not mention the anonymous death-threat letters during the habeas hearing or during the course of his representation by the clinic.

Moreover, several other facts in the record support the conclusion that Matute has not established that a "reasonable person in [his] position would fear prosecution if returned to [Honduras]." Consequently, Matute has failed to establish that he was prejudiced by the withdrawal of his original application for asylum. When Matute was initially apprehended by the Border Patrol, he stated that he was enroute to Nebraska to seek employment and did not mention that he feared returning to Honduras. Furthermore, Matute's wife and four children still live in Honduras. Finally, the court notes that recent civil rights reports indicate that Honduras has conducted democratic elections since 1982 and that the most recent election was free and fair. See Senate Committee On Foreign Relations and House Committee on International Relations, Country Reports On Human Rights Practices For 1994, S.Prt. 104–12, 104th Cong., 1st Sess. (1995) (Exh. 103). Although there are reports of "extra-judicial killings" in Honduras, there are no reports of politically motivated killings, "disappearances motivated by politics," or "torture for political motives." *Id.*

Consequently, assuming that Matute could show that the clinic provided ineffective representation at the deportation hearing on May 30, 1995, Matute has not made the required showing that he was prejudiced by the withdrawal of his asylum application. Therefore, Matute has not established that his deportation hearing was fundamentally unfair.

### C. Conclusion

After reviewing the record, the court finds and concludes that there is no basis for granting Matute's petition for habeas corpus relief (filing no. 1). Even assuming that the court has jurisdiction to consider Matute's claim of alleged ineffective assistance of counsel, Matute has not shown that his counsel was ineffective or that he was prejudiced by the withdrawal of his application for political asylum. Finally, the district director's denial of Matute's application for stay pending the decision on his motion to reopen or reconsider was not an abuse of discretion.

THEREFORE, IT IS ORDERED:

(1) That the "Petition for Writ of Habeas Corpus" (filing no. 1) filed by the petitioner, Jose A. Valerio Matute, is dismissed; and

(2) That the stay of deportation ordered by this court (filing no. 2) is vacated and set aside under the circumstances.